**FILED**
**March 26, 2020**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

WALKER, J., dissenting.

The majority states that the family court devoted "only one brief paragraph" to the children's best interest and that the order "gives no indication that [the appropriate] factors were considered." The majority then concludes that the family court erroneously relied upon a single factor in its analysis—the ability for each parent to foster a relationship between the children and the other parent—and that "its conclusion as to that factor is not supported by the record." I disagree. Review of the family court's order shows that, although the court did not explicitly state that it was undertaking a best interest analysis, the family court appropriately considered all relevant best interest factors as enumerated in the West Virginia Code,[1] and its conclusions are amply supported by the record. So, I would affirm the decision of the family court.

Beginning with the single factor identified by the majority,[2] the family court found that "it is in the best interest of the child [sic] to live with a parent who will not actively seek to disparage or diminish the children's time with the other parent." According to the majority, this finding was unsupported by the record because the family court discounted the guardian ad litem's testimony at the final hearing that the children had "a

---

[1] W. Va. Code § 48-9-102; W. Va. Code § 48-9-206; W. Va. Code § 48-9-209.

[2] In reality, this "single factor" is derived from a combination of three others: West Virginia Code § 48-9-102(a)(3), West Virginia Code § 48-9-206(a)(1), and West Virginia Code § 48-9-209(a)(4).

1

really close bond with their mother . . . [and] with their baby brother." While the guardian did, in fact, present this testimony, there is no evidence that the family court "completely ignored" it. Rather, the family court explicitly analyzed both the guardian ad litem's testimony and his written reports. But it is clear from the order and from the record that the family court discounted his testimony at the final hearing because it contradicted his prior written reports, in which he indicated that the children had an *equal* bond with both parents. The guardian ad litem has repeatedly taken contradictory stances throughout these proceedings. For example, in his filings with this Court, the guardian ad litem unilaterally adopted Respondent Father's position that the family and circuit courts had appropriately decided the matter below. But at oral argument, he took the opposite position.[3]

A similar situation arose below as the guardian ad litem's reports indicated that the children had an equal bond with both parents, but his testimony indicated that the children were more strongly bonded to the mother. The family court was within its discretion, in the face of this contradictory information, to determine which position was more accurate. In doing so, the family court had ample evidence to weigh in determining

---

[3] Specifically, at oral argument, the guardian ad litem stated that the children were "more bonded with their mother," but there is no evidence in the record substantiating this contention. In fact, by his own statements, the guardian ad litem had no further contact with the children beyond the closure of this matter in 2018, with the exception of a single chance encounter on Halloween. So, there is little possibility that the guardian ad litem would have substantial new information upon which to base any new recommendation. Due to this lack of evidence, the guardian ad litem's change of position carries little weight. If the guardian had additional information leading him to change his position in this case, he should have presented it to this Court via an updated status filing.

whether the children had a stronger bond with either parent.  The family court considered, in addition to the guardian ad litem's reports, testimony from CPS workers which indicated that, despite reports that the children feared their father, their interactions with him did not reflect this.  The family court also heard testimony from the children's grandmother and from CPS workers that the children's relationship with their father deteriorated significantly during the brief separation period caused by the Domestic Violence Protection Order.

And, the family court also considered the Mother's attempts to alienate the children from the Father.  Even though the court concluded that it could not find by a preponderance of the evidence that such alienation occurred, the court emphasized the need to "look to the parent more likely to support a consistent relationship with the other parent" and found that it was in the best interest of the children to "live with a parent who will not actively seek to disparage or diminish the children's time with the other parent."  In that vein, the family court considered testimony from CPS worker Smith that he had suspicions the children were being coached, and that he found the children to be "highly motivated" to find a way to live with their mother.  In addition, he testified that the children tended to "balloon reality," citing an incident when the children called their mother to inform her that the father's girlfriend had not fed them and locked her own child in his room.  In fact, the call was made early in the morning, the girlfriend had not yet awoken, the children had not attempted to wake her, and the girlfriend's child was confined in his room because he is severely autistic and tends to wander at night.  All of the above findings, coupled with

3

the Mother's multiple unsubstantiated allegations of abuse and neglect against the Father, give rise to the inference that the Mother would not be likely to foster a relationship between the Father and the children. On the other hand, the family court had evidence before it that the children were regularly permitted to call the Mother when in the Father's custody.[4]

This evidence, which was considered by the family court, implicates several of the appropriate best interest factors. Pursuant to West Virginia Code §§ 48-9-102(a)(3) and 48-9-206(a)(1), the court could infer that the children had an equal bond to both parents, and there was clear evidence in the record that separation from the Father resulted in rapid deterioration of his relationship with the children. Under § 48-9-206(a)(4), there was no clear "disparity" in the quality of the children's attachment to one parent over the other such that emotional harm would have resulted in their residing with either parent, and under § 48-9-206(a)(5), the children would be in the care of loving, competent adults with either parent. Finally, under § 48-9-102(a)(4), the children had meaningful contact with their mother when in custody of their father, but the family court reasonably inferred from

---

[4] At oral argument, counsel for the Mother stated that at some point, the father prevented the children from speaking to their mother for several days such that the mother felt the need to call the police. First, that matter is still pending in circuit court so that information is not properly before us for review. Second, based on the mother's history of untruthfulness and motivations to regain primary custody of her children, the veracity of her contentions is questionable at best.

the evidence before it, which also implicated the limiting factors under West Virginia Code §§ 48-9-209(a)(4) and (5), that the children would not likely have meaningful contact with their father if they were in the custody of their mother.

The majority next takes issue with the the family court's refusal to hear the guardian ad litem's testimony regarding the children's custodial preference under West Virginia Code § 48-9-206(a)(2). First, the statute provides that we must consider the preferences of children over the age of fourteen, but it is undisputed that the children here are both significantly younger and have no inherent right to nominate their guardian. And, the statute provides that younger children who are mature enough to intelligently articulate a voluntary preference may have their preference considered, but the family court had before it significant evidence that these children were not mature enough to intelligently articulate a voluntary preference. Specifically, the family court again highlighted the fact that these children were highly motivated to live with their mother and that they tended to "balloon reality." Such findings clearly undercut the children's maturity and ability to articulate a voluntary preference. In addition, a review of the record reveals that the younger child particularly lacked the ability to articulate an intelligent voluntary preference because her stated reason for preferring not to reside with her father was: "I just don't like going [to dad's] because it is boring." So, the circuit court was clearly justified in declining to hear the guardian's testimony on this matter.

5

Turning to the legislative goal under West Virginia Code § 48-9-206(a)(3) that siblings be kept together, the family court's order explicitly addressed this. The family court found that the half-sibling resides in South Carolina with the mother, and that the children's relationship with this sibling would be preserved during their extended visits to the mother's home over summer vacations, school breaks, and long weekends. That determination was well within the court's discretion and is not plainly wrong.

And the family court also implicitly considered the factors in West Virginia Code § 48-9-102(a)(1) and § 48-9-206(a)(6) that promote the stability of the child. Specifically, the family court made multiple findings that the children were established in school in Mercer County, that they had extended maternal and paternal family in the county capable of providing child care, that they had an established community and peer group in the region, and that they were enrolled in counseling in Mercer County. On the other hand, the children have none of the above in South Carolina. In fact, the family court determined that one of the Mother's stated reasons for moving to South Carolina—to be closer to her parents—was untenable because her parents still resided more than two hours from her home in Myrtle Beach.

The only statutory factors the family court did not explicitly consider were: (1) the existence of some agreement as to the children's upbringing[5] and (2) the stage of

---

[5] W. Va. Code §§ 48-9-102(a)(2) and 48-9-206(a)(5).

the children's development.[6]  The first is inapplicable because the parents' prior agreement was an equal custodial split, which is not now achievable due to the mother's relocation. The second is implicit in the family court's analysis of the children's maturity with regard to their ability to express a custodial preference.

These are young children, ages six and nine, who undoubtedly have two loving parents who are able to provide safe homes.  But, the family court appropriately weighed the relevant factors and determined that the best interests of these children would be best served by remaining with their father.  It is not the province of this Court to reverse the lower court's decision simply because we would have come to a different conclusion on the same facts.  The family court's reasoning was well-supported by the record, and while the order was not a model of clarity, it contained the fundamental analysis required under West Virginia Code §§ 48-9-102, 48-9-206, and 48-9-209.  As such, the majority has strayed from our well-established standards of review, and resulted in the Court's micromanaging the decisions of the lower courts simply because it was unhappy with the outcome.  Because that is contrary to both our established law and our appellate role, I respectfully dissent.

---

[6] W. Va. Code § 48-9-206(a)(8).